IN THE UNITED STATES COURT OF APPEALS
FOR THE FIFTH CIRCUIT

United States Court of Appeals
Fifth Circuit

**F I L E D**

January 31, 2008

Charles R. Fulbruge III
Clerk

No. 07-40292

UNITED STATES OF AMERICA

Plaintiff - Appellee

v.

CARMEN CARLOS GARZA

Defendant - Appellant

Appeal from the United States District Court
for the Southern District of Texas, Brownsville
USDC No. 1:06-CR-970-ALL

Before KING, DeMOSS, and SOUTHWICK, Circuit Judges.

PER CURIAM:[*]

Defendant-appellant Carmen Carlos Garza appeals from a jury verdict finding him guilty of assault on a federal officer. Garza argues that the district court erred in denying: (1) his motion to dismiss for want of jurisdiction; (2) his motion to suppress; and (3) his motion for new trial, based on an alleged Brady violation. For the following reasons, we affirm the district court's judgment.

---

[*] Pursuant to 5TH CIR. R. 47.5, the court has determined that this opinion should not be published and is not precedent except under the limited circumstances set forth in 5TH CIR. R. 47.5.4.

## I. FACTUAL AND PROCEDURAL BACKGROUND

Defendant-appellant Garza was indicted on one count of forcibly assaulting, resisting, opposing, impeding, intimidating, and interfering with Joseph A. McGallicher, a law enforcement officer for the United States Fish and Wildlife Service ("FWS"), while he was engaged in his official duties, in violation of 18 U.S.C. § 111.  On December 15, 2006, following a two-day trial, a jury found Garza guilty of the offense charged, and he was sentenced to five months confinement in a halfway house, five months home confinement, and a three year term of supervised release, and ordered to pay a $3,000 fine and $100 special assessment fee.

The events giving rise to Garza's conviction center on an investigatory traffic stop in Willacy County.  On May 24, 2006, Garza was driving south on Willacy County Road 30 ("CR 30"), an unpaved, narrow road with several deep potholes, that runs through the Teniente Tract of the Lower Rio Grande Valley ("El Teniente Refuge"), a federally owned national wildlife refuge.  At the same time, McGallicher was patrolling CR 30 with Charles Rhodes, also an officer for FWS.  When the officers, driving north, passed Garza's truck, they noticed an expired inspection sticker, and turned around to initiate a traffic stop.

The precise actions of McGallicher and Garza during the traffic stop were disputed at trial.  According to McGallicher's and Rhodes's testimony, McGallicher walked up to the driver's side window of Garza's truck, identified himself, and informed Garza that his inspection sticker was expired.  He then requested Garza's driver's license and proof of insurance.  In response, Garza stated, "You don't have authority or jurisdiction to stop me, this is a county road. I will not give you my driver's license or insurance."  At that point, Garza placed his truck into gear and started to pull away.  McGallicher reasserted his jurisdictional authority, ordered Garza to stop, and removed his pepper spray from his holster, warning Garza that if he did not comply, he would be sprayed.

In response, Garza stopped the truck and yelled obscenities at the officer. Rhodes testified that he tried to open the passenger side door, but it was locked. While McGallicher was standing at the driver's side window, Garza began to accelerate the truck again, and McGallicher reached in the driver's side window, attempting to turn off the ignition. Garza grabbed McGallicher's arm and shouted, "Get out of my truck." McGallicher ordered Garza to release him, at which point Garza released McGallicher's arm for a brief moment and then grabbed his arm a second time. Throughout this exchange, Garza's truck continued to move forward. McGallicher was unable to free his arm from Garza's grip and had to sidestep along with the truck, to keep his balance and prevent from being dragged down the road. Rhodes testified that, at that point, he assessed the condition as a deadly force situation and unholstered his service weapon. McGallicher then used his free arm to disperse pepper spray into Garza's eyes, which caused Garza to let go of McGallicher's arm. McGallicher was able to pull the keys from the ignition and stop the vehicle. Afterward, McGallicher ordered Garza to exit, but he refused. McGallicher opened the driver's side door and observed Garza holding his face and shouting obscenities. McGallicher again insisted that Garza exit his truck, and this time, Garza complied and demanded the officers call the Willacy County Sheriff to their location. While waiting for the sheriff's department to respond, Rhodes assisted Garza in washing his eyes out with water. In addition to McGallicher's and Rhodes's testimony relaying the aforementioned events, the government produced photographs showing the location where Garza was stopped, the tire marks in the road made by the truck's movements, and the distances between those locations.

Nonetheless, Garza testified to a different account of the investigatory stop at trial. According to his testimony, Garza was pulled over by McGallicher and informed of his truck's expired inspection sticker. McGallicher asked Garza for

his driver's license and proof of insurance, and Garza informed McGallicher that he did not have his driver's license because he was not carrying his wallet with him. McGallicher made repeated requests for Garza's license. Garza told McGallicher that the license was at his house, a little over a mile away, and suggested that they both go to the house to retrieve it. McGallicher began to move away from the driver's door window and toward the rear of the truck. Garza thought that McGallicher was going to follow him home to retrieve his driver's license, and he turned his face toward the back window of his vehicle to look behind him. At that point, McGallicher pepper sprayed Garza. Thereafter, Garza turned off his truck, exited it, and was subsequently assisted by Rhodes. Garza insists that he neither touched nor dragged McGallicher, and that Rhodes remained in the patrol car during the incident, only exiting after Garza was pepper sprayed.

Before trial commenced, Garza filed a motion to dismiss for want of jurisdiction and a motion to suppress, arguing that because CR 30 did not qualify as a "highway" under Texas law, McGallicher had no jurisdiction to stop Garza and thus was not engaged in official FWS duties. After conducting an evidentiary hearing, the district court denied both motions.

After his conviction, Garza filed a motion for new trial, submitting that a government report referred to during trial contained exculpatory and impeaching information and was suppressed in violation of Brady. By order and opinion on February 27, 2007, the district court denied Garza's motion for new trial. Thereafter, Garza filed a timely appeal.

## II. DISCUSSION

### A. Motion to Dismiss For Want of Jurisdiction and Motion to Suppress

We review the district court's ruling on jurisdiction de novo. Bravo v. Ashcroft, 241 F.3d 590, 591 (5th Cir. 2003). In reviewing a motion to suppress, we view the evidence in the light most favorable to the prevailing party. United

States v. Bolden, 508 F.3d 204 (5th Cir. 2007) (citations omitted). Conclusions of law are reviewed de novo and findings of fact for clear error. Id.

Section 111(a)(1), the statute under which Garza was convicted, imposes criminal liability upon one who assaults a federal employee "while engaged in or on account of the performance of official duties." 18 U.S.C. § 111(a)(1). Congress's purpose in enacting § 111(a)(1) was "to protect individual federal officers by providing a federal offense triable in a federal forum to supplement the state statutes for punishment of such attacks." United States v. Kelley, 850 F.2d 212, 214 (5th Cir. 1988). Section 111(a)'s protection applies to "any officer or employee of the United States or of any agency in any branch of the United States Government (including any member of the uniformed services)," 18 U.S.C. § 1114, and, as such, includes FWS officers. The duties of a federal employee are a question of federal law, but whether an assaulted federal employee is "engaged in" official duties when he is assaulted, or whether the assault takes place "on account of" these duties, are questions of fact properly submitted to the jury. Kelley, 850 F.2d at 213.

Garza argues that the district court erred in denying his motion to dismiss for want of jurisdiction and his motion to suppress because McGallicher, as an FWS officer, did not have federal jurisdiction to conduct the investigatory traffic stop for an expired state inspection sticker on CR 30. Garza posits that CR 30 does not qualify as a "highway" as that term is defined in Texas Transportation Code § 541.302(5) because the road is not publicly maintained by the county, and there are no boundary lines.[1] Therefore, Garza claims that because he never violated the underlying state law, as he was not operating his vehicle on a "highway" without a valid inspection sticker, see TEX. TRANSP. CODE ANN.

---

[1] The Texas Transportation Code defines "highway or street" as "the width between the boundary lines of a publicly maintained way any part of which is open to the public for vehicular travel." TEX. TRANSP. CODE ANN. § 541.302 (emphasis added).

§§ 542.001, 548.602, McGallicher's actions in attempting to enforce said state law could not have been within his scope of duty.

The National Wildlife Refuge System is regulated under Title 50 of the Code of Federal Regulations. Section 27.31 of that title governs FWS's control over vehicles traveling within a national wildlife refuge. See 50 C.F.R. § 27.31. In particular, § 27.31(f) prohibits vehicles traveling on and through public use lands that do not bear valid license plates and are not properly registered and inspected in accordance with applicable state law.[2] At the suppression hearing, the government established through the uncontradicted testimony of Louis Jules DuBois, Jr., a land surveyor for FWS, that the subject section of CR 30 running through El Teniente Refuge is property owned by the federal government, and that there are boundary signs within the refuge marking the property as United States Fish and Wildlife property. In addition, Garza admitted to having an expired state inspection sticker. Therefore, McGallicher had federal authority and was acting within the scope of his duties when he stopped Garza's truck, as Garza was traveling on CR 30 through El Teniente Refuge, property owned by the federal government, without a valid state inspection sticker. See § 27.31(f).

---

[2] Section 27.31 provides:

> Travel in or use of any motorized or other vehicles . . . is prohibited on national wildlife refuges except on designated routes of travel, as indicated by the appropriate traffic control signs or signals . . . and subject to the following requirements and limitations:
>
> . . . .
>
> (f) The operation of a vehicle which does not bear valid license plates and is not properly certified, registered, or inspected in accordance with applicable State laws is prohibited.

50 C.F.R. § 27.31(f).

Garza's argument is based on the mistaken assumption that McGallicher was attempting to enforce a traffic law of the state made applicable to the wildlife refuge area under 50 C.F.R. § 27.31(a). However, that provision only applies when no other regulation covers the situation,[3] which is not the case here. Consequently, his jurisdictional argument must fail. Furthermore, as his motion to suppress was predicated on the same jurisdictional theory, we need not reach that issue. The district court properly denied both motions.

B. Motion for New Trial Based on Brady Violation

Garza argues that the district court erroneously denied his motion for a new trial based on the alleged failure of the government to turn over exculpatory and impeaching evidence as required by Brady v. Maryland, 373 U.S. 83 (1963). While the standard of review for a motion for a new trial is typically abuse of discretion, if the reason for the motion is an alleged Brady violation, then we review the district court's determination de novo. United States v. Martin, 431 F.3d 846, 850 (5th Cir. 2005).

"We review Brady determinations using a three part test under which a defendant must show that: (1) evidence was suppressed; (2) the suppressed evidence was favorable to the defense; and (3) the suppressed evidence was material to either guilt or punishment." Id. (citations and internal quotation omitted); see Strickler v. Greene, 527 U.S. 263, 281–82 (1999). Favorable evidence includes that which is exculpatory and that which could impeach a prosecution witness. United States v. Bagley, 473 U.S. 667, 676–77 (1985). Evidence is material "if there is a reasonable probability that, had the evidence been disclosed to the defense, the result of the proceeding would have been different."

---

[3] Section 27.31(a) provides that "[u]nless specifically covered by the general and special regulations set forth in this chapter, the laws and regulations of the State within whose exterior boundaries a national wildlife refuge or portion thereof is located shall govern traffic and the operation and use of vehicles." 50 C.F.R. § 27.31(a) (emphasis added).

Kyles v. Whitley, 514 U.S. 419, 433 (1995) (citation and internal quotation omitted). "A 'reasonable probability of a different result' is shown when the suppression 'undermines confidence in the outcome of the trial.'" Graves v. Dretke, 442 F.3d 334, 340 (5th Cir. 2006) (quoting Kyles, 514 U.S. at 434). The materiality test is not a test of the sufficiency of the evidence and harmless error review does not apply. Id. (citing Kyles, 514 U.S. at 435). The final aspect of materiality to be stressed "is its definition in terms of suppressed evidence considered collectively, not item by item." Kyles, 514 U.S. at 436.

Garza claims that he was denied due process of law because the government suppressed an investigation report written by McGallicher, which contained Brady material. The report chronicled the events that form the basis of the indictment and McGallicher's actions following the incident. Specifically, Garza contends that the following portions of the report contain material, exculpatory and impeaching evidence:

> Charges:
> I called Assistant United States Attorney Terra Bay and informed her of the situation. I asked if I could arrest Garza on Federal Assault on a Federal Officer charges (18 USC 111) and she told me, "no." She informed me that I could have Willacy County Sheriff's Deputies arrest him for resisting detention or resisting arrest, but that would be up to them. She informed me that if they would not arrest, then I would have to write him tickets for violations and send him home.
>
> Based on AUSA Bay's advice, I talked to Willacy County Chief Deputy D. Martinez and was informed by him that the County District Attorney would not take the case.
>
> . . . .
>
> On-Going Investigation:
> I contacted Assistant United States Attorney Terra Bay on May 25th and we spoke about the case. During the conversation, AUSA Bay informed me that she did not

> know that Garza had actually driven his truck approximately 45 feet while holding onto my arm. She informed me she was under the impression that I had stopped him before he began to drive away.

First, Garza maintains that the Willacy County District Attorney's denial of prosecution is exculpatory evidence, and that had defense counsel been aware of McGallicher's report, he would have subpoenaed Willacy County sheriff's department personnel "to confirm that they had declined to prosecute [ ] Garza." Second, Garza argues that the report establishes that McGallicher relayed inconsistent narratives of the incident to Bay, the prosecuting attorney, and thus it is exculpatory and impeaching evidence. Garza's counsel avers that had he been furnished the report prior to the first day of trial, he would have "filed a motion to disqualify [prosecutor] Bay because of her status as a fact witness who heard prior inconsistent statements" made by McGallicher and "planned a thorough attack upon McGallicher's prior inconsistent statements about what happened on May 24, 2006."

In the district court's opinion and order denying the motion for new trial, it determined that McGallicher's report represented discretionary choices whether to bring charges against Garza and did "not tend to establish [Garza's] innocence." Therefore, the district court found that the report was not exculpatory. Also, the district court pointed out that because a close examination of the report and McGallicher's trial testimony revealed that the two were not incompatible, any alleged inconsistency was neither exculpatory nor impeaching evidence. The district court then proceeded to conclude that McGallicher's report was also immaterial, and that it had not been suppressed.[4]

---

[4] The district court determined that, at best, the report would only give rise to the inference that McGallicher's initial account to Bay was incomplete or misunderstood. And, since the report was disclosed to Garza on the day McGallicher testified at trial, the district court found it had not been suppressed. See Lawrence v. Lensing, 42 F.3d 255, 257 (5th Cir. 1994) (holding that evidence having impeachment value was not suppressed within the

9

Reviewing the district court's determination de novo, we conclude that even assuming (without deciding) that portions of McGallicher's report were suppressed and favorable to Garza, the district court's denial of the motion for new trial was appropriate because the alleged Brady evidence in the report was not material to Garza's guilt. As mentioned above, the report states that Bay initially had a different understanding of the facts of the incident, and that Willacy County authorities declined to prosecute Garza. Even if the report had been used by Garza to develop an alternate strategy for cross-examining McGallicher and had prompted him to question Bay and a Willacy County official,[5] the absence of the report does not undermine confidence in the jury's verdict. At best, the report may have called into question what McGallicher initially told Bay. Nevertheless, we are not persuaded that the course of the trial would have been altered had the report been disclosed, considering that: (1) Rhodes presented testimony corroborating McGallicher's account; (2) photographs of the incident site consistent with both officers' accounts were presented; (3) additional wildlife refuge personnel testified about encounters they had with Garza in which he behaved aggressively regarding the government's control of the refuge lands; and (4) close inspection of the report and McGallicher's testimony reveals the two are likely compatible.[6] Moreover, the

---

meaning of Brady because it was disclosed by the prosecution at trial).

[5] Although, the district court determined that evidence of state or federal charging decisions was inadmissible, and Garza does not appeal these evidentiary rulings.

[6] The report states that, based on her initial conversation with McGallicher, Bay "did not know that Garza had actually driven his truck 45 feet while holding onto [McGallicher's] arm" and she understood that "[McGallicher] had stopped [Garza] before he began to drive away." As the district court found, this portion is not inconsistent with McGallicher's testimony, because at trial he stated that Garza stopped the first time he was ordered, but then drove away a second time. Instead, these statements present an incomplete understanding of the incident from Bay's point of view. Had Garza called Bay to testify as a fact witness, she would have explained, as she did to the district court, that her misunderstanding of McGallicher's narrative was the result of being distracted while

fact that Willacy County authorities refrained from prosecuting Garza does not undermine the jury's verdict in light of the fact that Garza was convicted under a federal statute for assaulting a federal officer.[7] Thus, we are not convinced that there is reasonable probability that the result of the trial would have been different if the report had been disclosed to Garza prior to trial. See Strickler, 527 U.S. at 289. Because the evidence fails at the materiality prong of the Brady test, the district court's denial of the motion for new trial was not erroneous.

### III. CONCLUSION

For the foregoing reasons, we AFFIRM the district court's judgment.

---

discussing the incident with McGallicher over the telephone and not the result of McGallicher's misstatements.

[7] We are benefitted by defense counsel's disclosure as to what his strategy would have been, had he known the information ahead of time. Specifically, he states that he merely would have confirmed that the Willacy County authorities refused prosecution. We are not free to speculate what other unspecified additional evidence consistent with the defense may have been discovered had the information about the refusal to prosecute been disclosed. See Wood v. Bartholomew, 516 U.S. 1, 6 (determining that "mere speculation" that disclosure would have spurred defense counsel to additional investigation does not make that evidence material).